UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VETSTEM BIOPHARM, INC., | Case No. 2:19-cv-04728-AB-PDx |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PLAINTIFF'S MOTION FOR ENTRY OF ADVERSE INFERENCES [DKT. NO. 159]** |
| CALIFORNIA STEM CELL TREATMENT CENTER, INC., | |
| Defendant. | |

This Report and Recommendation is submitted to the Honorable André Birotte Jr., United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I. VetStem's Proposed Adverse Inference Instruction

In this action, Plaintiff VetStem Biopharma, Inc. ("VetStem" or "Plaintiff") alleges that Defendant California Stem Cell Treatment Center, Inc. ("CSCTC" or "Defendant") infringes U.S. Patent No. 9,453,202 (the "202 Patent") by making, using, selling and/or offering to sell its Regenerative Stem Cell Therapies practicing the inventions claimed in a least claim 1 of the

202 Patent, which was issued on September 27, 2016.  [Dkt. No. 1, Compl. ¶¶ 25, 30-36.]

Before the Court is VetStem's motion for discovery sanctions in the form of the following adverse inference instruction related to damages.

> I instruct you that during discovery in this case.
>
> Defendant CSCTC was ordered to produce documents showing the number of Accused Procedures it has performed and its corresponding revenue. CSCTC failed to comply with those orders. This failure has compromised VetStem's ability to present evidence sufficient to determine with certainty the amount of revenue CSCTC has received from infringement of VetStem's patent rights.
>
> You, the jury, should infer from CSCTC's noncompliance that it withheld damages documents because producing them would help VetStem and hurt CSCTC.
>
> Therefore, to account for this CSCTC's misconduct, I instruct you that you should resolve any uncertainty you have about the number of Accused Procedures performed or about the amounts charged in VetStem's favor.
>
> This Court also makes the following findings that you must consider as true:
>
> 1. Evidence has been presented during this trial sufficient to show that CSCTC may have performed as many as 8,400 Accused Procedures.
>
> 2. Evidence has been presented during this trial sufficient to show that CSCTC charged $8,900 for each Accused Procedure performed from September 2016 through to March 2022.
>
> 3. Evidence has been presented during this trial sufficient to show that CSCTC charged its patients at least $15,500, if not more, for each Accused Procedure performed from March 2022 through to the present.

[Dkt. No. 159 at 8-9.]

The Court has considered the moving, opposing, and reply papers and pertinent applications and orders [Dkt. Nos. 159-161, 186, 189, 194-197, 202, 208, 212], and the arguments of counsel at the discovery hearings.  CSCTC failed to comply with the Court's discovery orders, and its inadequate and incomplete discovery responses obstructed VetStem in proving its damages.  VetStem is entitled to have curative instructions given at trial.

The undersigned will not be the trial judge in this case, and the precise contours of the jury instructions will be left to the trial judge.  The trial judge referred this motion to the undersigned for a report and recommendation, and a magistrate judge can make specific findings warranting adverse inference jury instructions, but "[t]he precise contours of such instructions must be left to the presiding judge who will determine the universe of jury instructions ultimately to be given in this action."  *Apple Inc. v. Samsung Electronics Co. Ltd.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) (citations omitted); *Doe v. Bridges to Recovery, LLC*, No. 2:20-CV-348-SVW, 2021 WL 4690830, at *16 (C.D. Cal. May 19, 2021) (precise wording of adverse inference instruction will be determined along with the remainder of the jury instructions); *Deerpoint Group, Inc. v. Agrigenix, LLC*, 2022 WL 16551632, at * 23 (E.D. Cal. Oct. 31, 2022) (same).[1]  The Ninth Circuit has held that a trial court's "adverse inference sanction should be carefully fashioned to deny the wrongdoer the fruits of its misconduct yet not interfere with the party's right to produce other relevant evidence."  *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 386 (9th Cir. 2010).

---

[1] A Magistrate Judge may recommend nonmonetary sanctions by report and recommendation to the District Judge presiding over the case.  *See* 28 U.S.C. § 636(b)(1)(B); *see also, e.g., Dolzhenico v. City of Los Angeles*, No. CV-15-4581 AB (SSx), 2016 WL 10587935, at *11 (C.D. Cal. Oct. 28, 2016) (recommending nonmonetary sanctions for failure to comply with discovery orders), *adopted*, 2017 WL 5643140 (C.D. Cal. Jan. 30, 2017).

Based on the record before the undersigned, and regardless of the exact wording, the contours of the instructions that the Court recommends are set forth in the Recommendation section below.

## II. Background

### A. September 2022 Informal Discovery Conference and Order

On September 13, 2022, this Court conducted an informal discovery conference to address six disputes arising from CSCTC's responses to VetStem's Requests for Production of Documents ("RFPs")[2] [*See* Dkt. Nos. 125, 125-1, 125-2.] RFPs 1-54 had been served in January 2020, and RFPs 55-61 were served in June 2022. [See Dkt. No. 126 at 3, n.2.]

Those disputes are as follows:

> 1.    Whether CSCTC's production of four annual P&L statements for the years 2016 – 2019 is sufficient to respond to Request No. 17, which requests: Documents sufficient to show the revenues (gross and net of related expenses), costs, and profit/loss, relating to the Accused Therapies on a quarterly and yearly basis (total and on a per unit basis), including, but not limited to, financial statements, balance sheets, income statements, pro forma earnings statements, and cash flow statements for the years 2016 through the present."[3]

> **VetStem's Statement** – Documents showing an accused infringer's profits, revenue, and the like attributable to its infringing conduct is "highly relevant" to the damages analysis and determination of a reasonable royalty under

---

[2] The informal discovery conference is required before a motion to compel can be filed. *See* http://www.cacd.uscourts.gov/honorable-patricia-donahue.

[3] Interrogatory No. 7 similarly asks CSCTC to "Provide and explain Your units sold, revenue, cost, and profits associated with Your providing the Accused Therapies to Your patients and customers from 2016 through the present. Your answer should include the total procedures performed and the dollar amount of revenue attributable to the sales and/or use of the Accused Therapies." CSCTC's response recites only the gross annual revenue amounts shown in the four P&L statements produced for 2016-2019.

4

the *Georgia-Pacific* factors. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, at *18 (C.D. Cal. Feb. 27, 2015). CSCTC acknowledged this information is relevant, that it exists, and that CSCTC is in possession of such documents by listing its "[d]ocuments related to revenue/income" as relevant evidence in its Initial Disclosures. Yet, now CSCTC inexplicably seeks to withhold from production all financial documents for 2020 onward, as well as impermissibly limit its production of damages-related documents to only a few high-level P&L statements.

CSCTC's Statement - CSCTC has produced certain financial documents to Plaintiff. The financial documents of CSCTC do not break down profit as a function of the Accused Therapies and include wholly irrelevant and confidential information related to medical treatments unrelated to this litigation and thus do not show profits, revenue, and the like attributable to its alleged infringing conduct. Moreover, the infringer's profits are not recoverable under 35 U.S.C. § 284. The *Georgia-Pacific* factors do not include the actual profits of the alleged infringer.

2.     Whether CSCTC's continued assertion that no documents exist that are responsive to Request No. 21 operates to limit the evidence and opinions CSCTC may rely on relating to damages and a reasonable royalty. Request No. 21 seeks production of "[a]ll documents describing, identifying, referring to, or relating to the royalty rate or rates that you contend would constitute a reasonable royalty for the '202 Patent under 35 U.S.C. § 284, assuming infringement of the '202 Patent, including at least: (1) any facts, circumstances, legal contentions, and other factors upon which you base your contention, including any or all of the factors to be considered under a *Georgia-Pacific* analysis; (2) the relevant time period(s) during which the rate or rates should be applied; and (3) any assumptions, estimates, circumstances, and calculations upon which you base such contention(s)."

**VetStem's Statement** – CSCTC should be held to its dubious assertion that over three years into this litigation, CSCTC remains unaware of any documents in existence

that relate to what CSCTC contends would be a reasonable royalty to license VetStem's patents. Accordingly, CSCTC should be barred from presenting expert opinion on a reasonable royalty amount and foreclosed from presenting any damages evidence beyond evidence timely disclosed and produced by VetStem. *MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1369 (Fed. Cir. 2021) (affirming exclusion of expert report on damages in *MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, No. 14-cv-03657-SI, 2019 U.S. Dist. LEXIS 110882 (N.D. Cal. July 2, 2019)).

**CSCTC's Statement** -- The *MLC Intellectual Prop., LLC* case cited by Plaintiff stands for the proposition that a party seeking damages has the burden of proof and needs to disclose documents related to its calculation of damages, including a reasonable royalty. Moreover, in *MLC Intellectual Prop., LLC* the party had the documents but did not properly disclose them. CSCTC is not seeking damages in this case but will be using an expert to rebut the damages opinion of Plaintiff's expert. **At this time, other than Plaintiff's own license agreements, CSCTC does not possess any documents responsive to this request**. *See, Carter v. Dawson*, 2010 WL 4483814, at *5 (E.D. Cal. Nov. 1, 2010) (defendants' representation that they are unable to locate responsive documents precludes the grant of a motion to compel "unless Plaintiff can identify a specific document that Defendants have withheld").

3.      Whether CSCTC's response to Request No. 52 is sufficient. Request No. 52 asks for production of "[a]ll documents and communications relating to the Accused Therapies received from or sent to Cell Surgical Network or its officers and directors, including all agreements, protocols, procedures, training, price sheets, suggested pricing, and any information relating to equipment or materials used to provide the Accused Therapies."

**VetStem's Statement** – CSCTC provides no specific objections to this Request for documents plainly relevant to infringement and damages. Yet, it blatantly flouts its obligation to produce responsive documents by baldly contending, without explanation, that no responsive

documents exist. As a medical clinic providing regenerative stem cell therapies, CSCTC simply must possess responsive documents or communications that: (1) memorialize its performance of the accused therapies; (2) detail the price billed to each patient for procedures performed; (3) detail the precise protocol for effecting the accused therapies performed; (4) set out the equipment used in performance of the Accused Therapies and the costs associated to each, among other responsive information.

**CSCTC's Statement** -- The request is vague as to "all documents and communications relating to the Accused Therapies received from or sent to Cell Surgical Network or its officers and directors"– received from whom and sent to whom. CSCTC will supplement its response to state (1) whether a diligent search has been conducted or completed; (2) whether the few documents identified represent all responsive documents or only a portion thereof; or, (3) whether any responsive documents are being withheld on the basis of an objection. Fed. R. Civ. P. 34(b)(2)(B)-(C).

4.      Whether CSCTC's production of four annual P&L statements is sufficient to respond to Request No. 54, which seeks production of "Documents evidencing Your billing practices related to Your sales of the Accused Therapies sufficient to show the amount charged to Your patients and customers for each Accused Therapy and the breakdown of costs included."

**VetStem's Statement** – Again, the information requested is undoubtedly relevant to damages, which CSCTC does not dispute. Despite this, CSCTC's response point to only four P&L statements for 2016-2019 as being fully responsive to this Request, while it withholds everything else. It is unfathomable that CSCTC could possess no documents showing the amounts charged to its patients for performance of the Accused Therapies.

**CSCTC's Statement** - CSCTC has produced certain financial documents to Plaintiff. The financial documents of CSCTC do not break down profit as a function of the Accused Therapies and include wholly irrelevant and confidential information related to medical treatments

unrelated to this litigation and thus do not show profits, revenue, and the like attributable to its alleged infringing conduct. Moreover, the infringer's profits are not recoverable under 35 U.S.C. § 284.

5.     Whether CSCTC's response to Request No. 55 that no responsive documents exist is sufficient and whether this response wrongly rests on factual allegations non-responsive to the Request. Request No. 55 seeks production of "[d]ocuments evidencing all transactions between You and the Cell Surgical Network ('CSN') for the sale or purchase of kits or equipment for performing the Accused Therapies made from Q4 2016 to the present, including payment of fees or royalties to You by CSN relating to solicitation of new Affiliates to CSN and/or sales of kits or equipment to other Affiliates of CSN." CSCTC alleges that CSCTC and CSN do not transact business with one another and that equipment used by CSCTC was obtained "either at cost or directly from the manufacturer."

**VetStem's Statement** – CSCTC does not deny that it is an "Affiliate" within the CSN network of clinics providing the Accused Therapies. Further, documents produced show that CSN is the exclusive distributor of the kits and equipment used by its Affiliates to provide the Accused Therapies. CSCTC001499-1502. CSCTC's response is therefore vague, non-responsive, contrary to the evidence, and plainly rests on allegations wholly irrelevant to the Request in an attempt to improperly withhold relevant evidence from production.

**CSCTC's Statement** -- CSCTC's response stated that CSCTC received the equipment directly from the manufacturer. CSCTC received the equipment under the exclusive distributorship agreement (CSCTC001499-1502) directly from the manufacturer. **Thus, no documents responsive to the request exist. CSCTC will supplement its response** to state (1) whether a diligent search has been conducted or completed; (2) **whether the few documents identified represent all responsive documents or only a portion thereof**; or, (3) whether any responsive documents are being withheld on the basis of an objection. Fed. R. Civ. P. 34(b)(2)(B)-(C). *See, Carter v.*

*Dawson*, 2010 WL 4483814, at \*5 (E.D. Cal. Nov. 1, 2010) (defendants' representation that they are unable to locate responsive documents precludes the grant of a motion to compel "unless Plaintiff can identify a specific document that Defendants have withheld").

6.      Whether CSCTC's response to Request No. 56 that no responsive documents exist is sufficient and whether this response wrongly rests on factual allegations non-responsive to the Request. Request No. 56 seeks production of "[d]ocuments evidencing any revenue, fee, or payments owed by You to CSN in connection with the performance of the Accused Therapies from Q4 2016 to the present." CSCTC states in reply, without support, "CSCTC owes no revenue, fees or payments to CSN."

**VetStem's Statement** – VetStem incorporates its remarks corresponding to Request No. 55 herein. CSCTC's response that no documents exist because it purportedly "owes no revenue, fees or payments to CSN" is non-responsive to the full scope of the RFP. Further, it improperly presents a narrative response more appropriate for responding to an interrogatory (which would be accompanied by an executed verification statement in that context) as being responsive to a request for the production of documents.

CSCTC's Statement - CSCTC will supplement its response to state (1) whether a diligent search has been conducted or completed; (2) whether the few documents identified represent all responsive documents or only a portion thereof; or, (3) whether any responsive documents are being withheld on the basis of an objection. Fed. R. Civ. P. 34(b)(2)(B)-(C). *See, Carter v. Dawson*, 2010 WL 4483814, at \*5 (E.D. Cal. Nov. 1, 2/]010) (defendants' representation that they are unable to locate responsive documents precludes the grant of a motion to compel "unless Plaintiff can identify a specific document that Defendants have withheld").

[Dkt. No. 125-2 (emphasis added).]

The Court heard argument from both parties and then ordered CSCTC to produce all documents in its possession, custody or control that are

9

responsive to RFP Nos. 17, 21, 52, 54, 55, and 56 (the "Subject RFPs") and certified responses to all RFPs propounded by VetStem to CSCTC, including but not limited to the above-listed RFPs (the "September Order"). [Dkt. No. 125.] The Court also authorized VetStem to file a motion to compel if necessary after reviewing the documents and responses produced by CTCSC in response to the September Order. [*Id.*]

On September 28, 2022, CSCTC provided fourth supplemental responses to the RFPs stating, among other things, that the estimated 15,000 patients treated since 2010 includes all patients by the entire Cell Surgical Network ("CSN"), by hundreds of doctors around the world over whom CSCTC has no control with regard to recordkeeping. [Dkt. No. 195-2 at 4.] CSCTC further stated that a much smaller number of patients were treated by CSCTC related to the Accused Therapies, though this fourth supplemental response does not provide that number or any other information to corroborate this claim. [*See Id.*] These statements also appear to be inconsistent with Dr. Lander's October 6, 2021 declaration in this case that he had analyzed CSCTC's network database in which all procedures are recorded, that the database contained nearly nine years of data, and that it reflected 13,610 patients. [Dkt. No. 96-1 ¶ 2.] Dr. Lander was able to consult this database, which he called "CSCTC's network database in which all procedures are recorded" when he was providing evidence to support CSCTC's since-debunked non-infringement argument, but as set forth below, in response to VetStem's discovery requests Dr. Lander swore to the Court that the information was only maintained in handwritten patient files that would require thousands of hours of manual review.

## B.   October 2022 Motion to Compel

On October 3, 2022, VetStem filed a motion to compel, stating that in response to the September Order, CSCTC produced four documents totaling

seven pages, which comprise profit/loss statements for 2020-2022, and a single price sheet annotated to state that it has only been in use since March 2022. [*See* Dkt. No. 126 at 2-4.]

CSCTC opposed the motion on the ground that it had produced all responsive documents in its possession, custody or control, in compliance with Fed. R. Civ. P. 34. [*See* Dkt. No. 127.] VetStem's reply explained why several assertions in CSCTC's opposition were not credible. [*See* Dkt. No. 128.]

On October 19, 2022, the Court conducted a hearing on the motion to compel. [*See* Dkt. Nos. 130, 136.] The Court and VetStem's counsel questioned Dr. Elliot Lander, the CEO and President of CSCTC, about the paucity of documents produced in response to the Subject RFPs. [*Id*. at 24.]

> The Court:  Dr. Lander, what documents does CSCTC have relating in any way to the expenses that it incurred in connection with the Accused Therapies – the therapies that are the subject of this lawsuit?
>
> The Witness:  Your Honor, the only records we have of expenses is on the P&L where we show, you know, the line items that depict what – what makes up our cost structure. We don't have anything more specific than that because we haven't broken it down any more than that.
>
> The Court:  But obviously – perhaps not obviously, but CSCTC purchases the kits, correct?
>
> The Witness: Yes.
>
> The Court: CSCTC has to determine how many kits to purchase in a given time period, correct?
>
> The Witness:  Yes and no.  We purchase the kits and we just use them.  And, then, when we need more we get more.  We don't have a – we don't project needs and then – you know, our inventory system isn't quite that advanced.
>
> ****
>
> The Court:  How are the orders placed with Medikan?

11

The Witness: I actually don't know.  My staff has always done that.

The Court:  All right.  Well, Mr. Phillips, all communication with Medikan, all orders placed to Medikan, all receipts, invoices, email, communication of any kind regarding Medikan and CSCTC are responsive to the Plaintiff's Request.  And I order the defense to search diligently for them as is required by the Federal Rules and to produce them to the Plaintiff.

Mr. Phillips:  Your Honor, if I could --

The Court: It is not credible that there can be no record whatever of communications and sales with the supplier of the kits that are used.  Whether Dr. Lander has knowledge or not, someone at CSCTC must have knowledge.  They're in business and there must be a mechanism or decision made as to how many to order and when to order.  And certainly, there should be documentation, probably digital, given this is 2022 of the communications with Medikan.  So, I am ordering the Defendant to search diligently and produce those in discovery.

[Dkt. No. 136, pp. 14-16.]

The Court further ordered CSCTC to produce all documents reflecting all expenses and costs incurred in connection with the accused therapies and payments to manufacturers [Dkt. No. 136 at 25-27], as well as the payments received by CSCTC for the accused therapies.  [*Id*. at 27-30.]  Regarding the latter, Dr. Lander testified that CSCTC has no account receivable and no ability to determine the number of accused procedures performed or the price charged without spending "thousands of hours" conducting a manual review of every patient chart.  [*Id*. at 28-29.]  In fact, as Dr. Lander had stated in his October 2021 declaration in this case, as CSCTC counsel subsequently stated at the December 2022 status conference, and as CSCTC's Rule 30(b)(6) witness testified at his January 2023 deposition, CSCTC has access to a database which shows that the exact number of Accused Therapies performed

by CSCTC. [Dkt. No. 96-1 ¶ 2; 151 at 12, 195-1 at 17-18.]

At the October 2022 hearing, the Court ruled that unless the parties could stipulate to an amount charged by CSCTC for the accused therapies and the number of therapies, CSCTC was required to produce the information.[4] [Dkt. No. 136 at 29.]

At the time, the discovery cut-off was October 21, 2022. The Court recommended that counsel seek an extension of that cutoff to give CSCTC one final opportunity to comply with the Court's order to produce all documents in its possession, custody or control responsive to the Subject RFPs. [Id. at 44.]

On October 21, 2022, the parties jointly submitted a motion for this fifth extension of the deadlines, in which CSCTC "confirms the two-month extension of fact discovery is sufficient for it to search for, gather, and produce all documents and information ordered of it." [Dkt. No. 133 at 2.] The District Judge approved the request and extended the non-expert discovery cutoff to December 23, 2022. [Dkt. No. 135.]

## C. December 2022 Status Conference and Order

On December 5, 2022, the Court conducted a status conference to address whether CSCTC had complied with the Court's order to produce all documents in its possession, custody or control responsive to the Subject RFPs. VetStem advised that CSCTC had produced "about 150 pages total in the past six weeks" that was "nothing near being a complete production." [Dkt. No. 151 at 5.] VetStem detailed the deficiencies in the production. [Id. at 5-10]. CSCTC responded that it had produced a representative sample of patient files showing the amount charged for the accused therapy and that CSCTC does not dispute that it charges $8,900 for the procedure, and $15,500

---

[4] Regarding Dr. Lander's testimony as to the alleged burden, the Court noted that the parties could agree to retain a special master to conduct the review. [Dkt. No. 136 at 29.]

since March 2020.  [Id. at 11-12.]

CSCTC also stated in  response to the Court's order, that it had printed from a database a document showing the number of accused therapies performed by CSCTC through 2021, that it had performed a total of 289 accused therapy procedures through 2021, and that it would provide the 2022 number shortly.  [Dkt. No. 151 at 12-16.]  CSCTC's website contains the statement, "Over 15,000+ stem cell procedures & outcomes backed by patient reported data."  [Dkt. No. 189-4.]  Counsel for CSCTC stated that CSCTC had not performed over 15,000 stem cell procedures, that this is the number performed by CSN, and that CSCTC has two of the 152 clinics in the CSN. [Dkt. No. 151 at 15-16.]  CSN is a network founded by Drs. Lander and Berman, who also founded CSCTC [Dkt. No. 186-3, Lander Decl. ¶ 3], and is represented by the same counsel as CSCTC.  The Court also heard argument about VetStem's subpoena to CSN for documents and deposition testimony and ordered CSN to comply.

On December 7, 2022, the Court ordered as follows:

> Defendant's objections to Plaintiff's outstanding discovery requests for documents and information evidencing the total number of Accused Therapies performed and the revenue obtained by it relating to performance of the Accused Therapies are overruled.  Defendant is ordered to produce to Plaintiff all information responsive to these discovery requests that is in the possession, custody or control of Defendant and/or of Cell Surgical Network ("CSN") no later than December 13, 2022.
>
> This document production shall include, but not be limited to, all: (1) patient consultation forms; (2) procedure scheduling forms; and (3) operative reports for each performance of an Accused Therapy by CSCTC from 2016 to the present.
>
> Defendant shall identify the suppliers from whom it has ordered kits for performing the Accused Therapies since the

date of issuance of the '202 Patent, whether ordered directly from a third-party supplier or indirectly through CSN. For each supplier, Defendant shall provide all current contact information known to Defendant. As stated at the status conference, the deadline for production of this information was December 6, 2022.

As discussed at the status conference, the objections to the document subpoena served on CSN are overruled. No motion to quash the subpoena was timely filed. CSN is ordered to produce all documents and communications responsive to the subpoena no later than December 13, 2022. Such production shall include, without limitation, all documents and communications evidencing any and all performance of Accused Therapies by CSCTC, costs incurred by CSCTC for performing the same, and revenue obtained by CSCTC for performing the same.

[Dkt. No. 140.][5]

On December 13, 2022, the parties jointly moved to continue the discovery cutoff dates. The motion included a declaration from CSCTC's counsel that "[g]iven the number of documents and the matter in which they are maintained by Defendant, the complete document production cannot be performed by December 13, 2022." [Dkt. No. 142-1, ¶ 3.] The District Judge granted the request and extended the non-expert discovery cut-off to January 11, 2023. [*See* Dkt. No. 143.]

## D.   December 2022 Supplemental Responses

On December 23, 2022, CSCTC served a supplemental interrogatory response stating that it had performed 343 total Accused Therapies from 2016 through December 20, 2022. [Dkt. No186-1 at 6.]

## E.   January 2023 Supplemental Responses

On Jan 11, 2023, CSCTC served discovery responses stating that

---

[5] The District Judge denied CSN's motion for review of this December 7, 2022 order and overruled the objections on January 25, 2023. [See Dkt. Nos. 145, 146, 150.]

CSCTC derives 90% of its gross revenues from performance of the Accused Therapies.  [Dkt. Nos. 189 at 5; 189-2 at 5.]

### III.  Legal Standard

#### A.  Damages for Patent Infringement

Upon a finding of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284. Infringement compensation can be the reasonable royalty the patentee would have received through arms-length bargaining.  *See Lucent Technologies, Inc. v. Gateway*, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009).  To determine a reasonable royalty under the "hypothetical negotiation" approach, courts consider the 15 factors set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).  The Federal Circuit has " 'has sanctioned the use of the *Georgia–Pacific* factors to frame the reasonable royalty inquiry. Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue.' "  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 60 n.2 (Fed. Cir. 2012) (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011)).

#### B.  Adverse Inference Jury Instruction as Sanction for Discovery Violations

Rule 26(e) requires that Initial Disclosures under Rule 26(a), as well as discovery responses, must be supplemented or corrected by a party "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing" Fed. R. Civ. P. 26(e)(1)(A).

Rule 34, which allows any party to request the inspection or production of documents from another party, is one of the primary discovery tools available to litigants in the federal courts.  *Keith H. v. Long Beach Unified Sch. Dist.*, 228 F.R.D. 652, 655 (C.D. Cal. 2005).  In responding to requests under Rule 34, "[a] party has an obligation to conduct a reasonable inquiry into the factual basis of its discovery responses."  *Nat'l Acad., of Recording Arts & Sciences, Inc. v. On Point Events, L.P.*, 256 F.R.D. 678, 680 (C.D. Cal. 2009).

Rule 37 states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  *In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: ... (B) may inform the jury of the party's failure*."

Fed. R. Civ. P. 37(c)(1)(B) (emphasis added).  *See Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 354 (D. Az. 2022) (permitting defendant to inform jury pursuant to Rule 37(c)(1)(B) that plaintiff had withheld information in discovery).  As the court in *Fast* explained, blocking the use of information at trial is "no penalty when the withheld information is unfavorable to the party that failed to disclose it."  *Id.* (citing Fed. R. Civ. P. 37(c)(1)(A)-(C)).  *See K.J.P. v. County of San Diego*, 621 F. Supp. 3d 1097, 1143-44 (S.D. Cal. 2022) (jury properly informed of defendant's failure to supplement discovery); *N.W. v. City of Long Beach*, 2016 WL 9021966, at * 4 (C.D. Cal. June 7, 2016) (granting motion precluding defendants from introducing evidence at trial that was not produced in response to discovery requests and directing plaintiff to submit proposed adverse inference instruction that the undisclosed evidence would have been unfavorable to defendants); *Estakhrian v. Obenstine*, 2016 WL 6868178, at *12 (C.D. Cal. Feb. 29, 2016) (jury to be

informed by adverse inference instruction or in some other manner determined by District Court that defendant willfully and in bad faith refused to disclose to plaintiff relevant documents in his possession); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) ("Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to...give an adverse inference instruction.").

Rule 37(b) provides that if a party fails to obey an order to provide discovery, the court may issue an order "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b)(2)(A)(i). *See*

*Tessera, Inc. v. Sony Corp.*, 2013 WL 5692109, at * 3-4 (N.D. Cal. Oct. 18, 2013) (recommending jury instruction that court had ordered defendant to produce its sales data to plaintiff so plaintiff could use it to calculate damages, that defendant did not comply with the order, and that plaintiff had to use publicly available sales data relating to defendant to calculate claimed damages, and that jury may infer that defendant did not turn over its sales data to plaintiff, as it should have, because it believed the actual, complete sales data would have helped plaintiff and hurt defendant).

The sanction of an adverse inference instruction is typically employed in cases involving spoliation of evidence, rather than cases involving the non-production of evidence. *Residential Funding Corp.*, 306 F.3d at 106. The Second Circuit uses the same three-part test in both situations:

> [W]here, as here, an adverse inference instruction is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of

18

mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Id.* at 107.  "The Ninth Circuit has approved the use of adverse inferences as sanctions for spoliation of evidence, but has not set forth a precise standard for determining when such sanctions are appropriate." *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1054 (S.D. Cal. 2015).  Many district courts in the Ninth Circuit have adopted the Second Circuit's test.  *See Lakes v Bath & Body Works, LLC*, 2019 WL 2124523, at *3 (E.D. Cal. May 15, 2019), *Compass Bank*, 104 S. Supp. 3d at 1054 and n.2 (collecting cases).  The party alleging discovery misconduct has the "burden to prove by a preponderance of the evidence" that the misconduct occurred.  *Lakes*, 2019 WL 2124523, at *4.

## IV.  Discussion

As an initial matter, the Court finds VetStem has satisfied its burden to show CSCTC had an obligation to produce the materials sought in the Subject RFPs, and the Court finds that CSCTC violated the Court's September and December 2022 discovery orders.  CSCTC produced incomplete and inconsistent records regarding the small number of Accused Procedures it claims to have performed over the past five years, failed to produce any documents relating to kit orders from its primary supplier over the past five years, and made no production responsive to the subpoena to CSN. Significantly, in defiance of the September and December 2022 discovery court orders, CSCTC has never responded fully to the Subject RFPs for documents showing the number of Accused Procedures it has performed.  This information is relevant to the *Georgia Pacific* factors; in fact, CSCTC has

never argued otherwise.[6]  CSCTC had "a culpable state of mind" in failing to comply fully with the orders and producing incomplete, unverifiable information, and that the information CSCTC failed to produce is relevant to damages such that a reasonable trier of fact could find that it would support VetStem's claim for damages.

### A.   Proposed Findings Regarding Number of Accused Procedures Performed by CSCTC

VetStem also seeks an instruction that the Court has made the following findings, that the jury must consider as true: "Evidence has been presented during this trial sufficient to show that CSCTC may have performed as many as 8,400 Accused Procedures."  CSCTC strongly objects to this language as contrary to the discovery that it did produce and as arbitrary and unfounded.

### 1.   CSCTC's Claim That the Total Number of Accused Procedures it has Performed is Approximately 300

Having failed to comply with the Court's orders and to respond fully to the Subject RFPs, CSCTC contends it has performed approximately 300 procedures using the Accused Therapies and VetStem's calculation of 8,400

---

[6] This information is relevant to several of the *Georgia-Pacific* factors, including factor 6 ("the effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales,"); factor 8 ("The established profitability of the product made under the patent; its commercial success; and its current popularity."); factor 11 ("The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."); and factor 15 ("The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." ). *Georgia-Pacific*, 318 F. Supp. at 1120.

belies reason and logic.  [Dkt No. 186 at 9.]  CSCTC submits an April 2023 declaration by Dr. Lander that "CSCTC has produced approximately 300 medical records related to each of the accused therapies performed by CSCTC from 2016 through 2022."  [Dkt. No. 186-3, Lander Decl. ¶ 4.]  Dr. Lander also declares that CSCTC has produced a database printout showing the accused therapies performed by year and the doctor performing same, patient files containing the charge sheets for each patient receiving the Accused Therapies, and profit and loss statements for each year in question.  [Id.]  One page from the database printout that CSCTC produced, which is attached as Exhibit O to the Wojcio Declaration [Dkt. No. 189-16], is set forth below:

1

2

3



Exhibit
0006

Exhibit O
Page 1 of 12

The other 11 pages of the database report printout are similarly redacted.  This document totals the number of Accused Therapies performed by CSCTC at 42 in 2016, 42 in 2017, 76 in 2018, 54 in 2019, 50 in 2020, and 25 in 2021, for a total of 289.  [*See* Dkt. No. 189-16 at 13.]  It appears to contain no data for 2022.

CSCTC's December 2022 supplemental interrogatory responses state from 2016 through December 20, 2022, the total number of Accused Therapies it performed was 343.  [Dkt. No. 186-1 at 6.]  The interrogatory response also states that this number was determined using a CSN database used by CSCTC to gather clinical outcome data, and that the data entries were then used to search for and gather by hand CSCTC patient consultation forms, procedure scheduling forms, and operative reports associated with Accused Therapies.  [*Id*.]  In its opposition to the instant motion, CSCTC states that it has produced verified discovery responses and signed declarations that place the number of Accused Therapies it has performed "at approximately 300." [Dkt. No. 186 at 4.]  CSCTC offers no explanation for the different numbers. Instead, after multiple extensions of the discovery cutoff date and discovery orders to make complete productions, it asserts that the total number is "approximately 300."  *Id*.

The December Order required CSCTC to produce to VetStem all information responsive to its outstanding discovery requests for documents and information evidencing the total number of Accused Therapies performed and the revenue obtained by it relating to performance of the Accused Therapies, including but not limited to, all: (1) patient consultation forms; (2) procedure scheduling forms; and (3) operative reports for each performance of an Accused Therapy by CSCTC from 2016 to the present.  The heavily redacted printout produced by CSCTC and the "approximately 300 medical records related to each of the accused therapies performed by CSCTC from

2016 through 2022" [Dkt. No. 186-3, Lander Decl. ¶ 4] are insufficient to comply with this order.  Both the patient files and the database report are so heavily redacted that it is not possible to meaningfully correlate the information in each.  [Dkt. No. 189 at 4.]  The patient files that were produced were gathered only after the database report was created, and the database report was used as a roadmap to gather the patient files.  [Dkt. No. 186-1 at 6.]  CSCTC's process in creating the database printout, which included a search methodology with restrictive filters, combined with the redactions, resulted in an incomplete production that violates the October and December discovery orders.  Unsurprisingly, VetStem states that the information shown in the database printout does not match the information in the limited patient consultation forms produced by CSCTC.  [Dkt. No. 159 at 16.]  "Not only have far fewer than 289 patient record files been produced, the dates for the few that have been produced do not coincide with the yearly volumes shown in the database report for either CSCTC location for any year."  [*Id.*]

CSCTC produced insufficient documents to verify, corroborate or explain the contents of the database printout, and this incomplete production precludes VetStem – and the jury – from being able to determine whether the database printout is accurate or complete.  It is insufficient even for CSCTC's witness.  CSCTC's Rule 30(b)(6) deposition witness testified that he could not answer VetStem counsel's question about the database printout without seeing the unredacted version – which was not produced to VetStem.  [*See* Dkt. No. 189-17 at 6-7.]  Moreover, CSCTC's Rule 30(b)(6) witness confirmed that the database was only consulted to generate the printout produced to VetStem, not to conduct the search required by the Court's orders to determine all Accused Procedures.  [*See* Dkt. No. 189-17 at 6-7.]

The incomplete production by CSCTC is also insufficient to determine the royalty base.  Information regarding the royalty base was responsive to

the Subject RFPs, CSCTC was ordered to produce it, and it failed to do so. CSCTC states that the number of procedures can simply be totaled and multiplied by the price.  "By using the patient files already produced and some basic math, Plaintiff is in a position to determine the revenue generated by CSCTC for performing the Accused Therapies."  [Dkt. No. 186-3, Lander Decl. ¶ 8].  CSCTC's responses to the Subject RFPs are so deficient that VetStem does not have the numbers necessary to conduct that "simple math."

CSCTC's "approximately 300" number of Accused Therapies performed from 2016 to 2022 is inconsistent with its January 2023 interrogatory responses that it derived 90% of its gross revenues from 2016 through 2019 from performance of the Accused Procedures and its claims regarding the price it charged for each procedure.[7]  [Dkt. No. 189-2 at 53.]  CSCTC contends that its "approximately 300" number covers both its clinics (in Beverly Hills and Rancho Mirage).  Using the 343 number in CSCTC's supplemental interrogatory response, 343 procedures over six years (2016 through December 20, 2022) is approximately 57 procedures per year performed by at least two doctors at two clinics – from which CSCTC derived 90% of its gross revenue.  Particularly in light of CSCTC's failure to respond fully to the discovery orders, CSCTC's claim regarding the total number of Accused Procedures that it performed is not credible.

### 2.   Proposed Finding Regard Number of Accused Procedures

VetStem requests an instruction that "[e]vidence has been presented during this trial sufficient to show that CSCTC may have performed as many

---

[7] For example, CSCTC states that its 2019 gross revenues related to the Accused Therapies, with about 10% unrelated thereto were $1.4 million in 2019.  Ninety percent of $1.4 million is $1.296 million.  CSCTC's database printout lists 54 Accused Procedures for 2019. [Dkt. No. 189-16.]   That would mean CSCTC grossed $1.4 million for performance of 54 procedures – which is inconsistent with CSCTC's claim regarding the price it charged patients.

as 8,400 Accused Procedures." This instruction maintains the ultimate fact-finding role of the jury by providing guidance for jurors to consider when they weigh the evidence. *See Johnson v. Wells Fargo Home Mortgage, Inc.*, 635 F.3d 401, 422 (9th Cir. 2011) ("We cannot conclude that the District Court abused its discretion or otherwise erred in ordering this [adverse inference jury instruction] sanction. Indeed, the District Court's sanction, which permits the jury to decide if any documents were destroyed when Johnson's hard drives were reformatted, strikes us as precisely the kind of flexible and resourceful sanction order that district judges should be encouraged to craft. We therefore affirm the sanction order."); *Apple Inc.*, 881 F. Supp. 2d at 1151 (adverse inference instruction provided guidance that jury "may choose to find determinative, somewhat determinative, or not at all determinative"); *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2019 WL 6527951, at *21 (S.D. Cal. Dec. 4, 2019) (imposing issue sanctions for failure to comply with discovery orders).

The 8,400 number is based on (1) statements of CSCTC representatives during this litigation; (2) statements by CSCTC on its website; (3) statements by CSCTC and its founders in peer-reviewed articles discussing its study outcomes; and (4) documents purporting to disclose the number of stromal vascular fraction ("SVF") kits ordered by CSCTC.

First, in October 2021 Dr. Lander submitted a declaration stating he had "analyzed CSCTC's network database in which all procedures are recorded," had "queried the database (nearly 9 years of data)" and that database contained 13,610 patients and listed 281 conditions treated by CSCTC. [Dkt. No. 96-1 ¶¶ 2-3.]

Second, the 2022 banner page of CSCTC's website states, "Welcome to Beverly Hills Stem Cell Treatment Center Harnessing cellular technology to improve the body's ability to heal itself". The next page states, "Home of

26

personal cell therapy", "Over 15,000+ stem cell procedures & outcomes backed by patient reported data" and "We have proudly been studying and providing safe, ethical, autologous (your own DNA) personal cell therapy to help people from a variety of autoimmune conditions, degenerative diseases, and chronic pain for well over a decade." [Dkt. No. 189-4 at 2, 3.] A reasonable inference from these statements is that CSCTC performed over 15,000 stem cell procedures. This number is consistent with Dr. Lander's October 2021 statement that 13,610 patients had been treated over nine years – approximately 1,500 procedures each year.

Third, VetStem submitted 2017 and 2019 scientific articles whose authors include Drs. Lander and Berman that discuss the studies of procedures involved in the Accused Therapies. [Dkt. Nos. 77-2; 159-2.] The study in the 2017 report involved 1,698 procedures performed on 1,524 patients between 2011 and 2016, and the study in the 2019 report involved 2,586 patients. [*Id.*] Although each study acknowledges contributions made by others, CSCTC is listed as the sponsoring entity with several physicians identified as doing work at CSCTC in connection with these patient-funded studies. [Dkt. Nos. 77-2 at 3; 159-2 at 10.] CSCTC's claim to have performed approximately 300 procedures from 2016 through 2022 is inconsistent with the information in these articles showing CSCTC's active participation in studies involving significantly more procedures.

Fourth, CSCTC produced a document entitled "Number of Kits Sold" showing the number of SVF kits it sold in the fourth quarter of 2016, and in 2017, 2018, and 2019 through March 2020.[8] [Dkt. No. 208.] The document is under seal. Its number reflect an average of 2,450 kits used annually. [Dkt. No. 159 at 12.] VetStem requested the number of kits used in discovery

---

[8] Despite being ordered to do so, CSCTC did not comply with its obligation to supplement this production for sales after March 2020.

because they function as a proxy for approximating the number of Accused Therapies performed. The use of a kit is contractually required for practice of the "CSN Method for Obtaining SVF" that is performed in connection with every Accused Procedure, and one kit is used for every procedure. [Dkt. No. 195-1 at 7-8.] There is a one-to-one correlation between kits acquired and SVF procedures performed. [*Id*; Dkt. No. 195-1 at 29.]

VetStem argues that this same evidence supports its calculation of 8,400 Accused Procedures. VetStem posits as follows: Dr. Lander's October 2021 declaration submitted in this case states that CSCTC's network database, in which all procedures are recorded, showed 13,610 patients over nine years. [Dkt. No. 96-1 ¶¶ 2-3.] In the study discussed in the above-referenced 2019 article about knee treatments, the 2,586 patients receiving treatment for knee arthritis, which is an Accused Procedure, calculates to 19% of the 13,610 number sworn to by Dr. Lander. This is a single study regarding knee procedures performed over four years, between 2012 and 2015. Dr. Lander declared that CSCTC's database shows 13,610 patients treated over nine years; consequently, the 2,586 patients from this knee study would account for approximately 43% of all patients treated over an average four-year span.[9] VetStem further asserts that if knee treatments account for such a significant portion of CSCTC's operation, then procedures of the type now accused of infringement likely represent the majority of all SVF procedures performed by CSCTC. [Dkt. No. 159 at 13.]

VetStem explains that its proposed adverse findings account for the Accused Procedures corresponding to most, but not all, of the patients and SVF procedures performed by CSCTC. Its proposed findings count 80% of the expected number of procedures determined above, taking into account the

---

[9] $\dfrac{2{,}586 \text{ knee study patients treated over 4 years}}{1{,}512 \text{ average patients per year} \ast 4 \text{ years}}$ = 42.7%

popularity of knee arthritis treatment and the scope of Accused Procedures, which encompass treatments at all other joints and for many other musculoskeletal conditions.  The 20% reduction is intended to exclude SVF procedures performed to treat other conditions, and it reduces the number of Accused Procedures performed to 8,400 from issuance of the 202 Patent through trial.[10]  [Id.]

CSCTC responds that the evidence put forth by VetStem to support the 8,400 number is not compelling and does not rebut what CSCTC characterizes as the "precise number of Accused Therapies performed by CSCTC."  [Dkt. No. 186 at 6.]  "Approximately 300" is not a precise number; perhaps CSCTC is referring to the 343 in its interrogatory responses, although it does not say so.  Citing *Tessera*, 2013 WL 5692109, CSCTC argues that the requested adverse inference instructions are disproportionate to the facts and circumstances of the case.  [*Id.*]  However, *Tessera* supports VetStem's position.  In *Tessera*, the defendant did not comply with the court's order to produce sales data requested by the plaintiff, though it did provide that data to its expert.  *Id*. The sanction requested by the plaintiff was exclusion of evidence and testimony from the expert based on the withheld sales data.  *Id*.  Finding that sanction disproportionate to the defendant's offense, the court concluded that the appropriate sanction was the following adverse inference instruction:

> During pretrial discovery, the Court ordered Sony to produce its sales data to Tessera so Tessera could use it to arrive at a calculation of claimed damages.  Sony did not comply with that order, and Tessera had to use publicly available Sony sales information to calculate its claimed damages.  Sony later gave its sales data to its own expert who used it to calculate a measure of damages different

---

[10] <u>15,000 SVF Procedures (CSCTC Website)</u>     =   1,500 procedures annually
     10 years of data

   1,500 procedures annually * 7 years (2016-2022)     =   10,500 procedures
   10,500 SVF procedures * 80% (limit to musculoskeletal) =    8,400 procedures

> than Tessera claims.  You may infer that Sony did not turn over its sales data to Tessera, as it should have, because it believed the actual, complete sales data would have helped Tessera and hurt Sony.

*Id.* at *4.  VetStem seeks a similar instruction here.  Unlike the remedy sought by the *Tessera* plaintiff, the remedy proposed by VetStem does not preclude CSCTC from seeking to introduce in evidence at trial the discovery relevant to damages that it did produce (though it should not be permitted to introduce new or contrary evidence regarding damages that it did not produce).  Like the plaintiff in *Tessera*, VetStem has used publicly available information (the CSCTC website and the scientific articles discussed above) to attempt to calculate damages.  As in *Tessera*, the proposed instruction in this case is tailored to the discovery violation and the circumstances of the case, including the availability of the unproduced information from public sources.

In arguing that the proposed inferences, in particular the reference to 8,400 Accused Procedures over six years, are disproportionate to the facts and circumstances of this case, CSCTC articulates deficiencies in VetStem's reliance on the CSCTC website statement referring to 15,000+ procedures, the scientific articles, and the kit invoices.  [Dkt. Nos. 186 at 6-7, 186-3 Lander Decl. ¶¶ 3-6.]  CSCTC does not mention Dr. Lander's October 2021 declaration  which he states that he analyzed CSCTC's network database in which all procedures are recorded, and that the database contained nine years of data regarding 13,610 patients.  [Dkt. No. 96-1 at ¶ 2.]  CSCTC does contend that the 8,400 number "belies reason and logic."  [Dkt. No. 186 at 9.]  In fact, 8,400 procedures over six years is 1,400 procedures per year.  According to CSCTC, two doctors performed the procedures, which is 700 procedures per year per doctor, or approximately 14 procedures per week.  CSCTC states that this is impossible, though it fails to support this conclusion with any specific information.

**B.    Proposed Finding Regarding Prices Charged by CSCTC for Accused Procedures**

CSCTC does not dispute the standard pricing of $8,900 per Accused Procedure before March 2022 and $15,500 per Accused Procedure after that date.  [Dkt. No. 186 at 8.]  CSCTC raises the "caveat" that some Accused Therapies were performed at reduced pricing and others were performed for free, as evidenced by the patient files produced for each patient which includes the price charged for the Accused Procedures.[11]  [Id.]  CTCSC provides no further details regarding the reduced prices or the number of procedures performed for free.  VetStem responds that the patient files are incomplete and do not correlate  with the database printout.

**V.    Recommendation**

Based on the record before the undersigned, and regardless of the exact wording, the Court recommends the contours of the instructions should be along the following lines:

- First, the instructions should inform the jury that CSCTC was ordered by the Court to produce documents showing the number of Accused Procedures it has performed.
- Second, the instructions should inform the jury that CSCTC was ordered by the Court to produce all documents reflecting all expenses and costs incurred in connection with its performance of the Accused Procedures.
- Third, the instructions should inform the jury that CSCTC was ordered by the Court to produce all documents reflecting all payments received by CSCTC for the accused therapies.

---

[11] As set forth above, at the December 5, 2022 hearing, CSCTC stated that it had produced this information in response to the Court's orders.  This information is relevant, responsive to the Subject RFPs, and it should not have required a court order for CSCTC to produce it.

- Fourth, the instructions should inform the jury that CSCTC failed to comply with those orders.
- Fifth, the instructions should inform the jury that CSCTC's failure to comply with these orders has impaired VetStem's ability to present evidence sufficient to determine with certainty the amount of revenue that CSCTC received from infringement of VetStem's patent rights.
- Sixth, the instructions should inform the jury that as a result of CSCTC's failure to comply with these court orders, the jury should infer that CSCTC did not produce the documents because the contents of those documents would have been favorable to VetStem and unfavorable to CSCTC.
- Seventh, the instructions should inform the jury that to account for CSCTC's failure to produce the documents, jurors should resolve any uncertainty they have about the number of Accused Procedures performed or about the amounts charged in VetStem's favor.
- Eighth, the instructions should inform the jury that (consistent with the evidence introduced at trial), evidence has been presented during this trial that CSCTC charged $8,900 for each Accused Procedure performed from September 2016 through to March 2022 and that CSCTC charged its patients $15,500 for each Accused Procedure performed from March 2022 to the present.
- Ninth, the instructions should inform the jury that (consistent with the evidence introduced at trial), evidence has been presented during this trial that CSCTC conducted as many as 8,400 Accused Procedures from September 2016 through the

present.

These instructions preserve CSCTC's right to introduce the evidence that it produced in discovery regarding the number of Accused Procedures and revenue it obtained therefrom.  The contours of the instructions also do not preclude Dr. Lander or CSCTC's corporate representative from testifying about these topics, subject to cross-examination regarding the incomplete production of documents on these topics.  They do not direct the jury to make any specific finding about the number of Accused Procedures performed by CSCTC or the resulting revenue, but they do advise the jury about CSCTC's misconduct and the proper inferences therefrom, and they are carefully tailored to this case.

DATED: August 15, 2023

_____
PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

NOTICE

Reports and Recommendations are not appealable to the Court of Appeals but are subject to the right of any party to file Objections as provided in the Local Rules Governing Duties of Magistrate Judges, and review by the District Judge whose initials appear in the docket number.  No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.